NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

## IN RE TERMINATION OF PARENTAL RIGHTS AS TO C.C. and N.N.

No. 1 CA-JV 23-0069
FILED 10-5-2023

---

Appeal from the Superior Court in Maricopa County
No. JS20878
The Honorable Julia Ann Mata, Judge

**AFFIRMED**

---

COUNSEL

Thomas Vierling Attorney at Law, Phoenix
By Thomas A. Vierling
*Counsel for Appellant Mother*

Arizona Attorney General's Office, Phoenix
By Bailey Leo
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Vice Chief Judge Randall M. Howe and Judge Jennifer M. Perkins joined.

---

**K I L E Y**, Judge:

¶1          Teresa N. ("Mother") appeals the juvenile court's order terminating her parental rights to C.C. and N.N. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          Mother, who struggles with mental illness and mental deficiency, has three children, E.N., born in 2018; C.C., born in 2019; and N.N., born in 2021. Mother's involvement with the Department of Child Safety ("DCS") began shortly after E.N. was born when she disclosed to her physician that she was "having command hallucinations to hurt the baby." DCS removed E.N. from Mother's care and placed him with his father, Aaron C., who then initiated family court proceedings. Although the outcome of the family court proceedings is not clear from the record, Mother later reported that she is not "able to have any contact or relationship with [E.N.]"

¶3          In December 2019, DCS received a report that C.C.'s father Stephon C. ("Father") had physically abused Mother in C.C.'s presence and that Mother was neglecting to feed C.C. About a week later, C.C. was admitted to the hospital for "poor oral intake, vomiting, a viral infection, and a [urinary tract infection]." There, a DCS investigator spoke with Mother, who confirmed that Father had been violent and "choked" her on various occasions. Mother also disclosed that Father had "snap[ped] and "yell[ed]" at C.C., threatening to break her arms. When the DCS investigator asked Mother if C.C. was "behind . . . with her doctor's visits or immunizations," Mother replied that she wasn't sure. Mother also reported that she "had been diagnosed with schizophrenia and bipolar disorder" but that she was not taking medication. At that time, Mother and C.C. were living at a domestic violence shelter; Mother reported that she had no family or friends to provide support, claiming that her family "abuses babies."

¶4          DCS removed C.C. from Mother's care. Because Mother was unable to identify a family member who could serve as placement, DCS placed C.C. with a foster mother. Shortly thereafter, the DCS case manager referred Mother for services, including psychological evaluations, individual counseling with a domestic-violence component, parent aide services, parenting classes, and visitation.

¶5          Mother missed some of her scheduled visits with C.C. and arrived late to others. Although visitation supervisors noted that Mother "show[ed] love towards" C.C. during visits, they also reported that she "need[ed] constant guidance when handling and caring for" the child. Mother had to be repeatedly reminded, for example, to keep one hand on C.C. when changing her diaper on the changing table so that she could not roll off and fall to the floor. Mother also exhibited difficulty controlling her emotions, and, despite being "reminded to practice her ability to self sooth," would "scream[]" and "yell[]" when "upset."

¶6          Dr. Stephanie Leonard conducted a "psychological evaluation" of Mother in March 2020 "to assess for mental deficiencies or personality/psychological factors that may impact her ability to adequately care" for C.C. During the evaluation, Mother reported that she had been "diagnosed . . . with schizophrenia" but "didn't need" her prescribed medication and so "never took" it. Mother also acknowledged, however, that she hears "voices" and things that she knows "are not real," adding that the "voices get worse" when she is "stressed."

¶7          Dr. Leonard diagnosed Mother with schizophrenia, "Unspecified Depressive Disorder," a "mild" intellectual disability, and mild alcohol and cannabis use disorders "[i]n sustained remission." She determined that Mother lacks insight into her limitations and likely has trouble regulating her emotions and coping with stress. Opining that Mother's conditions greatly affect her parenting ability, Dr. Leonard determined that Mother's ability to safely parent C.C. in the foreseeable future was poor. Dr. Leonard recommended that Mother complete a psychiatric evaluation, "maintain compliance" with her "medication regimen," and participate in parent aide services as well as "individual therapy with at least a master's level therapist."

¶8          DCS referred Mother for all of the services Dr. Leonard recommended, but Mother struggled to meaningfully participate or progress in most of them. For example, although DCS referred Mother to individual counseling with a master's level therapist, she did not attend any sessions. At regularly scheduled parenting skills sessions, Mother was

"distracted," "seemed to have trouble remembering things" that were discussed during the sessions, and often failed to engage. After completing her first round of parenting skills sessions in August 2020, Mother "ha[d] not shown progress" in developing her parenting abilities. In the discharge report, the visitation supervisor noted that Mother had an emotional bond with C.C. but needed substantial guidance in caring for her. Accordingly, the supervisor recommended additional parent aide services for Mother.

¶9        Consistent with this recommendation, DCS referred Mother to parent aide services for a second time. Unfortunately, Mother struggled to attend the skill sessions consistently, often failing to arrive on time or cancelling at the last minute. In February 2021, the visitation supervisor reported that Mother's "protective capacities" had not increased and that Mother "need[ed] to gain more impulse control in regards to her emotions and anger." During her visits with C.C., Mother sometimes struggled to properly care for C.C. One time, for instance, she had C.C. drink water directly from a water bottle, which is "not safe" for a child C.C.'s age and caused her to "choke." Mother also failed to show up for a number of scheduled visits with little to no notice to the parent aide, attributing her last-minute cancellations to varied reasons that included delays in bus service, a break-in at her apartment, and a "SWAT team kick[ing] her door in."

¶10        In March 2021, Mother gave birth to N.N. at home. When Mother and N.N. were brought to the hospital later that day, Mother "struggled to provide a clear explanation as to why" she gave birth at home. Hospital staff had difficulty "following [Mother's] train of thought and speech to gather information" from her. Staff later reported that Mother was "minimizing" her seriously mentally ill ("SMI") status and "experiencing underlying delusions." At one point, Mother reported that "her 4 year old son," an apparent reference to E.N., "was dead." When asked about psychiatric treatment, Mother stated she had been receiving treatment but "stopped" because it was "fraudulent."

¶11        DCS removed N.N. from Mother's care and, because N.N.'s paternity has never been determined, placed him with C.C.'s foster mother.

¶12        In May 2021, DCS moved to terminate Mother's parental rights under the mental illness/mental deficiency ground as to both children and the 15-month out-of-home placement ground as to C.C. *See* A.R.S. § 8-533(B)(3), (B)(8)(c).

**¶13** Mother had "very minimal contact" with DCS in late 2021 and the first several months of 2022, and her visitation with the children lapsed. When Mother began to re-engage in services in May 2022, DCS referred her for a second psychological evaluation and to the Nurturing Parenting Program ("NPP"), which provides parenting classes, coaching, and one-on-one evaluations. Mother reported that she had self-referred to therapy with a provider called "Mama Bear," which DCS later learned provides virtual support group services and parenting classes. DCS received no information about the frequency or extent of Mother's participation with Mama Bear.

**¶14** Mother resumed visitation with C.C. and N.N., and the visitation supervisors reported concerns about her parenting. "[M]any times," they reported, a supervisor had to "intervene due to safety concerns" such as "leaving [N.N.] unattended on the couch" and "not understanding why this is unsafe."

**¶15** During a psychological evaluation with Dr. James Thal in May 2022, Mother acknowledged her need for mental health counseling, describing, for example, visual hallucinations she experienced of "a woman in a bloody dress." Mother also admitted that, despite her need for mental health services, she was not meaningfully participating in any services apart from visitation. She further stated that her three children had been removed from her care due to "false reports." Dr. Thal noted that Mother's "thoughts seemed disorganized" and he found it "very difficult" to "elicit a direct answer" from her. Moreover, Mother "seemed confused about children's basic medical and nutritional needs." When asked, for example, how often a child should have a dental appointment, Mother responded, "[t]wice a week."

**¶16** After interviewing Mother, conducting some assessments, and reviewing relevant records, Dr. Thal determined that Mother "suffers from severe and persisting mental disorders including cognitive deficiency and severe mental illness." He concluded that Mother was unstable with "significant cognitive deficits which . . . make[s] it very difficult for her to learn, retain, recall, and implement parenting skills and knowledge." He noted that Mother's "grasp of reality is significantly altered at times" and that, even when psychiatrically stable, she is likely "to be disorganized, distracted, and preoccupied." Dr. Thal opined that Mother is not capable of independently parenting a child and that her prognosis for being able to safely parent in the near future was poor due to "severe and persisting mental disorders including cognitive deficiency and severe mental illness."

He recommended that she participate in ongoing psychiatric care and take her prescribed medication consistently.

¶17 Mother's first NPP referral ended in August 2022; however, upon her request, the DCS case manager "submitted a renewal for her NPP." When Mother expressed dissatisfaction with the newly-assigned NPP provider, the DCS case manager accommodated Mother's concerns by arranging for NPP to assign a different provider. This provider had difficulty contacting Mother, who did not return phone calls or text messages and was not home when the provider went to meet her there. Although the provider was later able to contact Mother by phone for a parent session, ultimately the NPP referral was closed out due to the lack of further contact.

¶18 After a trial, the juvenile court issued a lengthy and detailed ruling finding that DCS had met its burden of establishing grounds for termination and that termination was in the children's best interest. The court therefore terminated Mother's parental rights to C.C. and N.N. Mother appealed. This Court has jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

¶19 Mother argues that the court erred by (1) not ordering a guardianship for the children in lieu of termination, (2) finding that DCS offered services to her that complied with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and (3) finding termination was in the children's best interests.

¶20 A parent's right to custody and control of his or her child, though fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The parental relationship may be terminated if the juvenile court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and finds, by a preponderance of the evidence, that termination is in the child's best interest. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022). We view evidence in the light most favorable to sustaining the juvenile court's findings, *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008), and we will affirm an order terminating parental rights absent an abuse of discretion, *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

¶21 We will "accept the juvenile court's findings of fact if reasonable evidence and inferences support them," *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016), and we will affirm the court's legal conclusions

unless clearly erroneous. *Brionna v. Dep't of Child Safety*, ___ Ariz. ___, ___, ¶ 31, 533 P.3d 202, 209-10 (2023).

## A. Mother's Claim Under Arizona's Parents' Bill of Rights

**¶22**　　　　Mother argues that the juvenile court erred by terminating her parental rights instead of appointing a guardian for the children. In support of her position, Mother cites Arizona's Parents' Bill of Rights, A.R.S. §§ 1-601 to 1-602, which provides in part that no "governmental entity" shall "infringe on" parents' "fundamental right" to "direct" their children's upbringing "without demonstrating" a "compelling governmental interest" of "the highest order" that cannot "otherwise [be] served by a less restrictive means." A.R.S. § 1-601. According to Mother, A.R.S. § 1-601 "mandat[es]" the "use of a less restrictive means" when "the government seeks to terminate parental rights." Ordering a guardianship here, Mother contends, would be a "less restrictive means" than termination "of providing [C.C. and N.N.] with a stable, permanent, loving home."

**¶23**　　　　Mother failed to properly preserve this argument, however, by not raising it with the juvenile court. Although Mother elicited testimony at trial about whether DCS had explored the possibility of establishing a guardianship for the children, she never invoked the Parents' Bill of Rights or otherwise argued that DCS is statutorily mandated to establish a guardianship as a less restrictive alternative to termination. By failing to present this argument to the juvenile court, Mother waived it. *See Kimu P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 39, 44, ¶ 19 n.3 (App. 2008) (noting that arguments "not raised in the juvenile court" are waived on appeal).

**¶24**　　　　Even if she had properly preserved the argument, Mother's contention that the Parents' Bill of Rights limits the court's authority to terminate parental rights overlooks A.R.S. § 1-602(B), which provides that "[t]his section does not prohibit a court from issuing an order that is otherwise allowed by law." Section 1-602(B) makes clear that nothing in the Parents' Bill of Rights restricts courts' authority to terminate parental rights under A.R.S. § 8-533(B).

**¶25**　　　　Further, no guardianship motion was ever filed, and Mother did not request a case plan of guardianship. The juvenile court lacked authority to order a guardianship that no party had requested. *See Ariz. Dep't of Econ. Sec. v. Stanford*, 234 Ariz. 477, 480, ¶ 14 (App. 2014) (finding that juvenile court could not initiate guardianship "in the absence of a statutorily compliant motion by a party to the proceedings"). Mother is

therefore entitled to no relief on her belated claim that the Parents' Bill of Rights required the court to order a guardianship in lieu of termination.

## B. Mother's ADA Claim

**¶26** Noting that DCS has an obligation to provide appropriate reunification services, Mother next asserts that the juvenile court erred in finding that DCS's reunification efforts satisfied its obligation under the ADA to reasonably accommodate her disabilities.

**¶27** Mother did not properly present her ADA claim because she did not raise it until trial. Waiting until trial to challenge the adequacy of DCS's reunification efforts deprived the juvenile court and DCS of the opportunity to take timely steps to address and perhaps resolve her concerns. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 18 (App. 2014).

**¶28** The juvenile court addressed Mother's ADA claim on the merits, however, and DCS does not argue waiver on appeal. We therefore address Mother's ADA claim on the merits as well.

**¶29** With limited exceptions, Arizona law requires DCS to make reasonable efforts to provide reunification services after removing a child from the parent's care. *See* A.R.S. § 8-846(A). Parental rights cannot be terminated on either of the grounds alleged here unless DCS had made a diligent effort to provide appropriate reunification services. *See* A.R.S. § 8-533(B)(8); *see also James H. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 1, 2, ¶ 8 (App. 2005) (noting that termination under A.R.S. § 8-533(B)(3) will "be upheld only if . . . the [mental health] condition either was not amenable to rehabilitative efforts or that such efforts had been provided but had proven unsuccessful"). Under the ADA and its implementing regulations, public entities have an affirmative duty to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter the nature of the service" provided. 28 C.F.R. § 35.130(b)(7)(i). The obligations imposed by Arizona statute and the ADA are coextensive; as this court has held, "Arizona's statutory requirement that DCS make reasonable efforts to provide reunification services satisfies the ADA's reasonable accommodation requirement." *Jessica P. v. Dep't of Child Safety*, 251 Ariz. 34, 39, ¶ 15 (App. 2021); *see also Vanessa H. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 252, 256, ¶¶ 19-20 (App. 2007) ("We view reasonable accommodations as a component of making 'reasonable efforts'" to "preserve the parent-child relationship.").

**¶30**        To satisfy its obligation to make diligent efforts to provide appropriate reunification services, DCS must provide the parent with the time and opportunity to participate in programs designed to help her become an effective parent. *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). DCS is not, however, required to "provide every conceivable service," "ensure that a parent participates" in services, *id.*, or "undertake rehabilitative measures that are futile," *see Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999).

**¶31**        Mother asks us to "conduct a de novo review" of the court's resolution of her ADA claim, asserting that the court's determination arises out of its "interpretation and application of statutes." Mother's argument, however, amounts to a challenge to the court's determination that DCS satisfied its obligation to provide appropriate reunification services. We review such a determination deferentially, not *de novo*, and we will affirm if supported by reasonable evidence. *See JS-501904*, 180 Ariz. at 353.

**¶32**        Mother argues that DCS failed to adequately accommodate her disability by failing to "hold any staffings with Mother to identify how to accommodate her needs." Similarly, she faults DCS for "requesting Mother to self-refer for services" instead of arranging services for her.

**¶33**        Contrary to Mother's argument, the record shows that DCS ensured that she received the services that Drs. Leonard and Thal recommended to address her mental health issues and help her become an effective parent. Indeed, Mother received a multitude of services over two-and-a-half years designed to address her cognitive deficiencies and mental illness. Although DCS initially asked Mother to self-refer for counseling, DCS ultimately referred her directly to a master's level therapist. Mother did not, however, attend those counseling sessions. Further, the DCS case manager assisted Mother in obtaining SMI services by scheduling an intake session with Southwest Network and providing a taxi referral to transport Mother to her intake session. Although Mother failed to show up for the initial intake session, she attended a rescheduled intake session and was assigned an SMI case manager who arranged for Mother to participate in individual therapy. Several months later, Mother's DCS case manager followed up by contacting Southwest Network to verify that Mother was, in fact, attending her scheduled appointments.

**¶34**        The case manager also met with Mother in person "to discuss what [DCS] was looking for in terms of her mental health services and what [DCS] w[as] asking her to participate in, and asked if she would need assistance in locating either a facility to do those services or assistance in

referring herself and to set up an appointment." However, Mother represented that "she was already participating in [services provided by] Lifewell," "did not wish to go elsewhere," and "did not need any assistance." When Mother complained about her NPP provider, the DCS case manager arranged for a new one to be assigned. And when that provider struggled to reach Mother by phone, DCS helped facilitate contact. The record refutes Mother's suggestion that DCS left her to fend for herself instead of assisting her in obtaining access to services.

¶35        Mother further argues that DCS failed to meet its ADA obligations by "not individualizing the services" offered to accommodate her "low reading and comprehension levels" and her difficulty "retain[ing] information long-term." The record does not support this contention. Instead, the evidence shows that Mother's evaluating psychologists were aware of her limitations when recommending services for her and that DCS followed their recommendations. The evidence also shows that DCS alerted Mother's service providers of her disabilities. Mother's DCS case manager provided Mother's therapist, for example, with a copy of her psychological evaluation.

¶36        Likewise, the DCS case worker spoke with Mother's NPP program providers about her disabilities, and they "adapted their teaching styles to . . . accommodate her as best as they were able to." The practitioners later reported, for example, that they would readdress subjects with Mother if she did not initially understand them. The practitioners also sent Mother text messages to remind her of scheduled sessions and the items she was required to bring (*i.e.*, diapers and age-appropriate food) and worked with DCS to facilitate sessions at Mother's home.

¶37        Mother did not testify at trial, and so presented no evidence that DCS or any service provider failed to accommodate her disabilities. The absence of any testimony or other evidence of any specific inadequacy in any of her services also supports the court's determination that DCS complied with its obligation to provide appropriate reunification services. *See Melissa W. v. Dep't of Child Safety*, 238 Ariz. 115, 117, ¶ 6 (App. 2015) (observing that "drawing a negative inference" from a parent's failure to testify at a termination trial is "particularly appropriate").

¶38        Reasonable evidence in the record shows that DCS and its providers accommodated Mother's disabilities. In any event, DCS need not provide "every conceivable service" or services that are futile, *JS-501904*, 180 Ariz. at 353, and, as the juvenile court noted, Dr. Thal testified that

Mother's prospects for being able to parent independently "are very poor." Dr. Thal's testimony, uncontroverted by any other expert testimony, makes clear that no additional reunification services would have been effective. *See Vanessa H.*, 215 Ariz. at 256, ¶ 20 (affirming termination order in view of "abundant evidence" that "no amount of 'reasonable efforts' in providing services would have enabled [mother] to function as a minimally adequate parent"). We therefore reject Mother's ADA claim. And because Mother raises no other challenge to the court's finding of grounds for termination under A.R.S. § 8-533(B)(3) and (B)(8), we affirm the court's determination that DCS met its burden of establishing grounds for termination.

### C. Mother's Challenge to "Best Interests" Determination

**¶39**        Mother also challenges the juvenile court's finding that termination was in the children's best interests.

**¶40**        Once the court finds at least one statutory ground for termination, "the interests of the parent and child diverge," and the court must balance the parent's "interest in the care and custody of his or her child . . . against the independent and often adverse interests of the child in a safe and stable home life." *Kent K. v. Bobby M.*, 210 Ariz. 279, 286, ¶ 35 (2005). "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990) (emphasis omitted). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018).

**¶41**        The court may find that a child would benefit from termination if an adoption plan exists, if the child is adoptable, *see id.* at 150-51, ¶¶ 13-14, or if the child "would benefit psychologically from the stability an adoption would provide," *JS-501904*, 180 Ariz. at 352. Conversely, the court may find that a child would be harmed by the continuation of the parent-child relationship "where there is clear and convincing evidence of parental unfitness which has not been remedied notwithstanding the provision of services by [DCS] and which detrimentally affects the child's well-being." *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989).

**¶42**        Here, the court found that the children are bonded to their foster mother, who provided them with a loving and nurturing home and

wished to adopt them. The court found that adoption would provide C.C. and N.N. with "stability and permanency" while "allow[ing] [the siblings] to remain together." Allowing the siblings to maintain their relationship, the court correctly noted, "supports a best interest finding. *See Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 378, ¶ 6 (App. 1998) (affirming termination based in part on evidence that foster family was "committed to adopting" both siblings, who were "very close"). The court also found that maintaining the parent-child relationship would be detrimental to the children because Mother, "while doing her best, is unable to care for the children or provide stability and basic needs." Reasonable evidence supports these findings.

¶43　　　　Mother does not dispute the court's findings about the benefits that the children would derive from termination and adoption by their foster mother. Mother argues, however, that the court erred in "fail[ing] to consider or address the terms of" Arizona's Parents' Bill of Rights "when deciding that a termination would be preferable to a guardianship." Because Mother waived this argument by failing to present it before or at trial, we will not consider it. In any event, because even a permanent guardianship is revocable, *see* A.R.S. § 8-873(C), a guardianship would not provide the children with the stability and permanency they would receive from termination and adoption.

¶44　　　　Noting that she "participated in some services" in an "effort to reunify with the children," Mother asserts that the court "did not give sufficient weight to [her] reunification efforts." But this Court will not reweigh the evidence presented at trial. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002). The court expressly considered Mother's reunification efforts and found them insufficient to offset the benefits the children would derive from adoption by their foster mother. Reasonable evidence supports this finding, which we therefore affirm. *See Demetrius L.*, 239 Ariz. at 3, ¶ 9.

## CONCLUSION

¶45　　　　For the foregoing reasons, we affirm.

